UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JANE DOE,

                              Plaintiff,

        -against-

                                                    15 CV 117 (AJN)(KNF)

THE CITY OF NEW YORK, et al.,

                              Defendants.
-------------------------------------------------------------x


### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
### DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT


Ellen B. Resnick
LAW OFFICES OF ALAN S. FUTERFAS
565 Fifth Avenue, 7th floor
New York, New York 10017
212-684-8400
*Attorney for Plaintiff*

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| TABLE OF AUTHORITIES | | iii |
| PRELIMINARY STATEMENT | | 1 |
| STATEMENT OF FACTS | | 2 |
| A. | THE INCIDENTS ALLEGED BY PLAINTIFF | 2 |
| | 1.  The October 2013 Incarceration | 2 |
| | 2.  The January 2014 Incarceration | 6 |
| B. | CAPTAIN PORTER'S HISTORY OF MISCONDUCT AT RMSC | 6 |
| C. | FACT EVIDENCE OF A CULTURE CONDUCIVE TO ABUSE AT RMSC | 17 |
| D. | EXPERT EVIDENCE OF THE CITY'S FAILURE TO PROTECT RMSC INMATES FROM SEXUAL ASSAULT BY DOC STAFF | 21 |
| | 1.  The City has been out of Compliance with National Correctional Standards for Years | 21 |
| | 2.  The City's Hiring Practices are Inadequate | 23 |
| | 3.  The Practice of Permitting Male Correction Officers to Guard Female Inmates without Supervision Violates Correctional Best Practices | 24 |

| | 4. | The City's Mechanisms to Report Sexual Assault are Deficient, including the Unwritten Code of Silence among Staff | 24 |
| | 5. | Inmates who Report Sexual Abuse Suffer Retaliation | 26 |
| | 6. | The City's Investigative Units Mismanage Investigations and thereby Encourage Sexual Abuse | 27 |

POINT ONE

SUMMARY JUDGMENT IS PRECLUDED FOR PLAINTIFF'S *MONELL* CLAIM, BECAUSE SEXUAL ASSAULT BY DOC STAFF IS AN OBVIOUS CONSEQUENCE OF THE CITY'S DEFICIENT PRACTICES ... 32

A. THE STANDARD OF REVIEW ON SUMMARY JUDGMENT ... 32

B. THE LEGAL STANDARD FOR *MONELL* LIABILITY ... 33

C. TRIABLE ISSUES OF FACT EXIST TO PRECLUDE SUMMARY JUDGMENT ... 39

| | 1. | Inadequate Investigation and Discipline | 39 |
| | 2. | Inadequate Hiring and Monitoring | 40 |

POINT TWO

SUMMARY JUDGMENT IS PRECLUDED FOR PLAINTIFF'S CLAIM OF NEGLIGENT SUPERVISION GIVEN THE CITY'S NOTICE OF CAPTAIN PORTER'S HISTORY OF MISCONDUCT ... 43

A. THE LAW OF NEGLIGENT SUPERVISION AND RETENTION ... 43

B. TRIABLE ISSUES OF FACT EXIST ... 47

POINT THREE

PLAINTIFF'S IIED CLAIM SURVIVES SUMMARY JUDGMENT ... 47

CONCLUSION ... 48

## TABLE OF AUTHORITIES

| Cases | Page |
|---|---|
| *Amnesty America v. Town of W. Hartford,* 361 F.3d 113 (2d Cir. 2004) | 34, 36 |
| *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) | 32 |
| *Anna O v. State of New York*, 34 Misc.3d 1206(A) (Ct. Cl. 2011) | 43, 44, 45, 46 |
| *Beck v. City of Pittsburgh,* 89 F.3d 966 (3d Cir. 1996) | 38 |
| *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397 (1997) | 34, 39 |
| *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501 (2d Cir. 2002) | 33 |
| *Campo v. Slater*, 128 Fed.Appx. 173 (2d Cir. 2005) | 33 |
| *Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) | 24, 33, 34, 35 |
| *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) | 32 |
| *City of Canton v. Harris*, 489 U.S. 378 (1989) | 33, 34 |
| *City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988) | 33 |
| *Connick v. Thompson,* 563 U.S. 51 (2011) | 33, 34 |
| *Danzer v. Norden Sys., Inc.*, 151 F.3d 50 (2d Cir. 1998) | 33 |
| *Doe v. Chenango Valley Central High School District*, 92 A.D.3d 1016 (3d Dep't 2012) | 46 |
| *Doe v. Montefiore Hospital* 2013 WL 624688 (S.D.N.Y. Feb. 19, 2013) | 44 |
| *Ehrens v. Lutheran Church*, 385 F.3d 232 (2d Cir. 2004) | 44 |
| *Estevez-Yalcin v. Children's Village*, 331 F. Supp.2d 170 (S.D.N.Y. 2004) | 45 |
| *Ewing v. Cumberland Cnty.,* 2015 WL 1384374 (D.N.J. 2015) | 38 |
| *Fiacco v. City of Rensselaer,* 783 F.2d 319 (2d Cir. 1986) | 36 |
| *Flaherty v. State,* 296 N.Y. 342 (1947) | 43 |
| *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir. 2005) | 32 |

*Jenkins v. City of New York*, 1992 WL 147647 (S.D.N.Y. 1992)     44

*Jones v. Town of East Haven*, 691 F.3d 72 (2d Cir. 2012)     34

*Kern v. City of Rochester*, 93 F.3d 38 (2d Cir. 1996)     33

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)     32

*Merman v. City of Camden*, 824 F. Supp.2d 581 (D.N.J. 2010)     38

*Miller v. City of New London*, 2015 WL 2240269 (D. Conn. May 12, 2015)     36

*Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978)     *passim*

*Morris v. State of New York*, 34 Misc.3d 1243(A) (Ct. Cl. 2012)     45

*Nevaeh T. v. City of New York*, 132 A.D.3d 840 (2d Dep't 2015)     45

*Palsgraf v. Long Is. R.R. Co.*, 248 N.Y. 339 (1928)     43

*Patterson v. State*, 44 Misc.3d 1230(A) (Ct. Cl. 2014)     44, 45

*Poore v. Glanz*, 46 F. Supp.3d 1191 (N.D. Okla 2014)     35-36

*Rankins v. Howard*, 2012 WL 5932029 (E.D.Wisc. Nov. 27, 2012)     36

*Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119 (2d Cir. 1991)     36

*Rodriguez v. City of New York*, 38 A.D.3d 349 (4th Dep't 2007)     46

*Sheila C. v. Povich*, 781 N.Y.S.2d 342 (1st Dep't 2004)     44

*Thomas v. Roach*, 165 F.3d 137 (2d Cir. 1999)     36

*Timothy Mc. v. Beacon City School District*, 127 A.D.3d 826 (2d Dep't 2015)     45

*Tolan v. Cotton*, 134 S.Ct. 1861 (2014)     32

*Ruiz v. County of Suffolk*, 2012 WL 1118605 (E.D.N.Y. Apr. 3, 2012)     40

*Sanchez v. State of New York*, 99 N.Y.2d 247 (2002)     43, 45, 46

*Stagl v. Delta Airlines*, 52 F.3d 463 (2d Cir. 1995)     43

*T.W. v. City of New York*, 286 A.D.2d 243 (1st Dep't 2001)     46
*Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995)     *passim*

*Vione v. Tewell*, 820 N.Y.S.2d 682 (N.Y. Co. 2006) — 44

*Ware v. Jackson County, Mo.*, 150 F.3d 873 (8th Cir. 1998) — 33, 36

*Young v. City of Providence*, 404 F.3d 4 (1st Cir. 2005) — 40

*Zeak v. United States*, 2015 WL 246340 (S.D.N.Y. Jan. 20, 2015) — 44

**Statutes**

Fed.R.Civ.P. 56 — 1

Fed.R.Civ.P. 56(c) — 32

Fed.R.Civ.P. 56(e) — 32

42 U.S.C. § 1983 — 1, 20, 33, 36

**Articles**

H. Brenner, et. al., "Bars to Justice: The Impact of Rape Myths on Women in Prison," Georgetown Journal of Gender and the Law, Vol. XVII, No. 2, 2016 — 42

## PRELIMINARY STATEMENT

Plaintiff Jane Doe files this memorandum of law in opposition to defendants' motion pursuant to Fed.R.Civ.P. 56 seeking partial summary judgment. Plaintiff 's Third Amended Complaint ("TAC"), filed on October 6, 2016, alleges claims against the City of New York and two individual defendants - former Department of Corrections Captain Pablo Porter and Correction Officer Emma Williams - under state law and the Civil Rights Act, 42 U.S.C. § 1983, arising from, *inter alia*, a brutal and sadistic physical and sexual assault of plaintiff in October 2013. Several claims were dismissed with prejudice by stipulation on August 17, 2017 (Dkt. No. 159), and additional claims are now withdrawn.[1] Triable issues of fact preclude partial summary judgment on the remaining claims: (1) *Monell* liability (Claim 32) (2) negligent hiring, training, supervision, discipline, staffing and retention of Captain Porter (Claim 31)(the "Negligent Supervision Claim"), (3) assault and battery against the individual defendants (Claims 2, 13 and 21), and (4) intentional infliction of emotional distress ("IIED") against the individual defendants. (Claims 3 and 14)

---

[1] Plaintiff does not pursue these additional claims: assault and battery against the City under a theory of *respondeat superior* (Claims 2, 13 and 21), *prima facie* tort (Claim 22) and conditions of confinement regarding an overheated cell)(part of Claim 32). Nor does plaintiff pursue the adequacy of the City's training of its correction officers specifically as to sexual safety as a separate basis for *Monell* liability (Claim 32).

## STATEMENT OF FACTS

### A.   THE INCIDENTS ALLEGED BY PLAINTIFF

#### 1.   The October 2013 Incarceration

On Friday evening, October 11, 2013, plaintiff Jane Doe, then a 34 year-old college-educated woman with no prior criminal history, was being processed as a newly admitted pretrial detainee at the Rose M. Singer Center ("RMSC") on Rikers Island ("Rikers").  Plaintiff was removed from the intake area by defendant Captain Pablo Porter ("Captain Porter"), defendant Correction Officer ("CO") Emma Williams ("Williams") and an unidentified male correction officer.  She was taken to an abandoned room in an unused and isolated area of RMSC, stripped of all her clothes, and handcuffed kneeling to a toilet fixture.  Over the next several hours, plaintiff was subjected to physical and sexual assaults in four separate incidents.  (TAC ¶¶ 34-60, the TAC is Dkt. No. 84; Jane Doe Dep. 13/14/14 Tr. at 128-208)(excerpts of plaintiff's deposition on November 14, 2014, pursuant to N.Y. G.M.L. § 50-h, and on January 12, 2017, are annexed as **Exhibit A** to the Declaration of Ellen B. Resnick ("Resnick Decl."))

Captain Porter guarded the half-open door to the pitch-dark room, holding his own flashlight aloft, as the unidentified male correction officer assaulted plaintiff vaginally and anally with a flashlight and then raped and sodomized her.  Captain Porter returned to the room by himself and subjected plaintiff to forcible oral sex.  Williams arrived at the room some time later with a different male correction officer and forced plaintiff to ingest a soapy liquid from a green cup.  Then, while Williams guarded the half-open door, this male correction officer forced plaintiff to rub his penis with her hands.  Williams pepper sprayed plaintiff's vagina and anus.  Captain Porter returned to the room with the first male correction officer, forced plaintiff to ingest a soapy liquid from another green cup and then demanded a sex act in exchange for the bottled water he was holding, saying: "I heard you give a very good hand job."  When plaintiff

resisted - despite her dire thirst - Captain Porter battered her with the bottle and slowly emptied its contents over her head. Williams returned and gave plaintiff torn sheets to clean up the blood and bodily fluids that had soiled her and the floor and instructed her to use a balled up sheet as a sanitary napkin because she was bleeding. Williams returned plaintiff's clothes and escorted plaintiff to a housing unit where she ordered plaintiff to take a shower and to return the bloodied sheet to her in exchange for a real sanitary napkin.

On October 12, 2013, as soon as plaintiff was able to make a phone call, she called her boyfriend and told him, in words and substance "I'm going to die. They're killing me." (TAC ¶ 69) Although this critical evidence of plaintiff's near-contemporaneous outcry from the assault was timely requested in January 2015, it was irretrievably lost by the City.[2]

Plaintiff was released from Rikers on October 17, 2013 with the help of an agent of Homeland Security for whom she had worked in an undercover capacity in an unrelated case before her arrest. (Ex. A at 57:1- 60:25) Within days of her release, plaintiff told a few people that she had been sexually assaulted at Rikers, including her cousin, who took photographs of plaintiff's injuries, and a woman residing on the property. (Ex. A at 235:6-13, 240:9-23). Plaintiff also told the Homeland Security agent and the assistant district attorney assigned to her case that she had been physically mistreated at Rikers. (Ex. A at 256:14-24)

In January 2014, plaintiff was briefly hospitalized for suicidal behavior arising from the events at RMSC in October 2013. (Ex. A at 250:24-251:19) She was diagnosed with post-traumatic stress disorder and prescribed medication. (Ex. A at 259:9-260:18) Plaintiff was diagnosed with a sexually transmitted disease arising from the sexual assaults. (Ex. A, 1/12/17

---

[2] *See* email chain between a Bronx County prosecutor and James Christo, investigator for the Department of Investigation ("DOI")(attached as **Exhibit O** to the Resnick Decl.) It is the City's policy to maintain recordings of prison phone calls for 18 months. (*See* DOI Hiring Report, **Exhibit N,** at 14, n. 15 (Exhibit N discussed *infra*).

Jane Doe Tr. at 17)(medical records for plaintiff are annexed as part of **Exhibit B** to the Resnick

Decl.)

Plaintiff's abduction from the RMSC intake by Captain Porter and CO Williams on a

Friday night was unremarkable and effortless because, in practice, the RMSC intake is a poorly

supervised and chaotic place. It is not just where newly admitted inmates - pretrial detainees -

arrive for processing, but where other inmates enter and leave the facility or are temporarily

held for disobedience. As former RSMC Warden Evelyn Mirabel described the intake area:

> We got new admissions [at intake], you can have ten, twenty, thirty come in.
> You get some that are intoxicated on drugs, alcohol, mental health issues, they
> are in the court system. They get arrested on Friday night, which is the worst
> night because they're not going to court 'til Monday. . . They just want to go to
> sleep and you got things to get done and you got to house them within twenty-
> four hours. … So you got a combination of things going on in that area and all
> kinds of temperaments going on. . . So you got a lot of anxiety in that area. And
> then other captains from other areas that have disruptive inmates bring them
> down there to calm them down some times, put them in a pen. So you have a lot
> going on.

(Mirabel Dep. Tr. at 176:18-178:17)(excerpts of the deposition of Evelyn Mirabel are annexed

as **Exhibit C** to the Resnick Decl.)

The DOC uniformed staff at intake are often inattentive to inmates, indifferent to their

welfare and interested principally in socializing among themselves. (Morgan Dep. Tr. at 17:25-

19:14; 22:20-23:24; 35:13-36:7)(excerpts of the deposition of Morgan are annexed as **Exhibit D**

to the Resnick Decl.); and Norton Dep. Tr. at 12:10-19:14, 22:20-23:19)(excerpts of the

deposition of Norton are annexed as **Exhibit E** to the Resnick Decl.)) DOC staff will assault or

threaten inmates at intake who they perceive as rude or disruptive (Ex. D at 26:21- 27:4, 70:20-

71:5) Yet, as former Warden Mirabel noted, newly admitted inmates are especially vulnerable

at intake "[b]ecause they haven't been in jail… they're first-time offenders, they're afraid, they

go in, they're afraid, you know, so it can happen that someone will try to intimidate the inmate

4

into doing something they wouldn't ordinarily do.  Anyplace you go where you're new, you're vulnerable…"  (Ex. C at 149:24-150:10, citing Exhibit 8 to the Gertzer Decl. (PREA Directive 2008))

The DOC uniformed staff control inmates' paperwork as they are processed at intake.[3] They also control the logbooks.  The Department of Corrections ("DOC") relies on handwritten manual logbooks to track the movement of inmates throughout RMSC, including during the intake process. (*See* Defendant's Memorandum of Law in Support of Partial Summary Judgment ("Def. Mem.") at 12 and Exhibit E to the Gertzer Decl.)  The captain on duty is responsible for ensuring the accuracy of logbook entries for the area; tour commanders review the logbooks during their tours.  (Ex. C at 102:13-25-103:2)  There is no independent safeguard against DOC uniformed staff making false entries[4] in the logbooks, rather "you have to rely on your staff to make proper entries… everybody basically relies on the people underneath them to make accurate entries."  (Ex. C at 104:7-8, 106:10-15)  In 2013, apart from areas under video monitoring, the City had no technology to record the location of correction officers in real time. (Ex. C at 106:16-107:4)[5]

---

[3] Emma Williams routinely worked at intake from 4:00 p.m.-12:00 p.m.  (Ex. D at 74:4-10)  If she took a dislike to an inmate: "[s]he would call you a bitch.  [If] she didn't like you, she did not like you, and she is never going to like you if she don't like you." (Ex. D at 74:4-75:5)  For such inmates, she would "take their paperwork [and] put it at the bottom, so they don't get processed."

[4] It is not plaintiff's burden in opposing the summary judgment motion to preview evidence that logbooks and other records of RMSC were manipulated to conceal defendants Porter and Williams' removal of plaintiff from the intake area and reappearance in a housing unit many hours later.   Plaintiff will present this proof at trial.

[5] Indeed, Mirabel testified that DOC conducted an isolated test of a device that was placed at intervals for correction officers to touch during their tours to record their movements, but it was sabotaged, and the experiment was discontinued.  (Ex. C at 105:4-106:7, 132:18-135:5)

2.   **The January 2014 Incarceration**

Plaintiff was remanded to RMSC on January 16, 2014 on a new charge.  On January 17, 2014, she told medical staff at intake that she had been the victim of a sexual assault in October 2013 from which she suffers from PTSD and was prescribed medication.  (DEF 6288-89) (pertinent medical records are annexed as **Exhibit B** to the Resnick Decl.)  On January 19, 2014, she was evaluated by a nonmedical staff-member of the RMSC mental health clinic. She reported suffering from PTSD since October 2013, and expressed extreme fear of the guards and her lack of confidentiality.  (Ex. B, DEF 6283-84)  Over the next several days, plaintiff was brought to a room near the RMSC clinic where she was subjected to physical and sexual abuse, once by Williams, and by two male correction officers.  (TAC ¶¶ 75-82)

**B.   CAPTAIN PORTER'S HISTORY OF MISCONDUCT AT RMSC**

Captain Porter should not have been in charge of the intake area on October 11, 2013.

Captain Porter testified that Mirabel "didn't think I was a good captain." (Porter Dep. Tr. at 175:23-25; excerpts of Pablo Porter's deposition are annexed as **Exhibit F** to the Resnick Decl.)

PAGES REDACTED

C.    **FACT EVIDENCE OF A CULTURE CONDUCIVE TO ABUSE AT RMSC**

Plaintiff's allegations support a finding that both Porter and Williams are the product of a culture at RMSC that imbues DOC staff with a sense of impunity. (See TAC ¶ 54: Porter, after beating plaintiff with a water bottle for refusing his command that she perform a sex act, told plaintiff: "This is what you don't want.  I'm in control here;" TAC ¶ 64: Williams instructing plaintiff right after the assault while escorting her to the housing unit: "This never happened. . . If it is being heard upstairs, things are going to be worse;" TAC ¶ 64: Williams encountering plaintiff at intake on October 16, 2013: "I want to make sure we still have our deal;" TAC ¶ 66: Porter, after accosting plaintiff just before her release on October 17, 2013: "If you say anything to anybody, nobody will believe you. . . Don't cry.  No one is going to come for you and I don't want you to bring attention to our group;" TAC ¶ 73: Williams encountering  plaintiff at intake on January 17, 2014: "you're back again…watch your back.")

Although – as the City correctly notes – DOC directives discourage sexual abuse of inmates, by, *inter alia*, proscribing "undue familiarity," e.g. socializing between guards and inmates (Ex. C at 124:16-127:21; see Ex. B to the Gertzer Decl.), these directives are ignored in practice.  The result is a climate tolerant of sexual fraternizing, and actual sexual relations, between male guards and female inmates.   Plaintiff's own sworn account attests not only to multiple sexual assaults that she suffered – in January 2014 as well as in October 2013 -- but to an expectation of male DOC staff to sexual submissiveness by female inmates.  (*See* TAC ¶ 25: Plaintiff was instructed to flirt with the guards to persuade them to give her food and water; TAC ¶ 32: an RMSC staff member, after molesting plaintiff during an intake examination, assessed plaintiff in sexual terms, telling a guard: "This one is a good one. We don't have many like her here;" TAC ¶ 69: another inmate advised plaintiff that she could make a phone call if she let the male correction officer watch her showering).

Deposition testimony provides additional evidence that DOC staff tolerates female inmates socializing with male guards. Captain Porter regularly socialized with "different random inmates." (Ex. D at 56:16-57:20)  Even recreation was a chance for organized socializing. (Ex. E at 63:23-67:16)[12]  Inmates obtained contraband from male correction officers as gifts in exchange for sexual relations.[13]  Although Porter knew that female inmates had access to contraband, because he was required to report it, he denied knowing that contraband was ever given in exchange for sexual relations with guards. (Ex. F at 51:16 -52:23)

Deposition testimony also produced evidence that sexual misconduct by male correction officers is prevalent.  According to Morgan, in 2013, a girl in the adolescent unit told her that one of the correction officers was sending girls to the storage closet where he would have sex with them. (Ex. D at 47:5-50:12)  At other times, inmates told her that they looked forward to spending time with male correction officers in the "bubble" – where they are not allowed to be – but where they were "having sex…all the time."  (Ex. D at 52:16-21)

Porter testified that he personally avoided hearing allegations of sexual misconduct to avoid the duty to report them. (Ex. F at 76:17 -77:3)  He also stated, incredibly, that he never heard of any sexual relationships between inmates and guards - even rumors - during his 13-plus years as a captain at RMSC. (Ex. F at 74:21-75:21)  Even former Warden Evelyn Mirabel acknowledged that, with regard to a sexual allegation, it is "probable" that correction officers

---

[12] Former inmate Norton used the grievance process to protest spending her recreation time with her housing unit in the gym socializing with male correction officers and watching them play handball bare-chested. (Ex. E at 63:23-67:16)  The grievance officer rebuked Norton in front of the on-duty "bubble" officer and a female inmate for "making the recreation officer look bad."  The grievance officer told her "that I was, in her opinion, very dangerous ... because I expected them to follow the rules." (Ex. E at 66:13- 67:16)

[13] Around 2004, Morgan observed contraband given in exchange for sexual relations. (Ex. D at 43:3-44:19) ("[A] girl was in the bubble [the viewing post in the housing unit] doing what they doing and she come out of the bubble with a fresh pack of Newports. Where do you get a fresh pack of Newports and they don't sell cigarettes in the commissary?")

"may want to back up each other with respect to not turning another CO in or maybe trying to back them up in terms of the story of an incident that happened." (Ex. C at 164:17-165:15)

Deposition testimony also provided evidence that DOC staff at RMSC, including Captain Porter, express a sense of impunity for any harm they inflict on inmates at RMSC, confident that any misconduct will go unpunished. Morgan testified that, between 2003 and 2013, there were "too many times" when Captain Porter, in particular, used too much force with female inmates who were handcuffed. (Ex. D at 25:11-26:18) In her words, he had "hand problems" - meaning he frequently hurt inmates. (Ex. D at 96:23-97:6) Morgan personally saw Captain Porter "rough people up" and be "disrespectful" to the inmates, calling them "bitches." (Ex. D at 15:10-16:14; 17:19-18:10) DOC staff used violence particularly in locations that were not monitored by cameras. (Ex. D at 26:11-18, 30:9-31:9, 70:16-71:8) It was Morgan's impression that Captain Porter must have had "a long, lengthy history with the Department of Corrections putting his hands on people." (Ex. D at 18:20-25) Yet, Captain Porter and other DOC staff openly laughed at the prospect of inmates filing complaints against them, because they felt protected by their union.[14] Their common refrain was: "I'm not afraid. I won't lose my job or I'll get transferred, they will move to me to another jail." (Ex. D at 40:3 - 41:15, *see* id. 97:4-98:10)

Porter's sense of impunity was fortified by the fact that his friend, CO Benny Santiago, escaped consequences for having sexual relations with female inmates. Santiago remained employed by DOC despite an investigation starting in May 2013 into his repeated rape and

---

[14] The union's unwavering support remains strong. In response to the recent claim by two RMSC inmates that a third inmate had raped them while correction officers turned a blind eye and assisted in the assault, the new union president - replacing Norman Seabrook who faces federal corruption charges - accused the rape victims of concocting defamatory stories against his union's members. (See "In Rape Case at Rikers: Did Guards Turn a Blind Eye, September 21, 2017, https://nytimes.com/2017/09/21/nyregion/Rikers-rape-case-guards.)

sexual assault of a female inmate, and despite several other claims of sexual assault.[15]  (*See*

discussion, *infra* at 25-31)  According to Morgan, Captain Porter had to know that Santiago[16]

was a "pervert" who was having sex with inmates, because "the other officers would talk about

it," and Porter and Santiago "were tight." (Ex. D at 62:12-23; see 58:9-18)

> All the captains and officers knew about Santiago. That's why I said, why he is
> no longer there. When I went back to jail in 2013, he was not there.

(Ex. D at 69:11-20)  Prior to 2013, Morgan saw Porter and Santiago walking and talking

together on their night shift. (Ex. D at 58:14-22)  Porter denied even knowing a DOC staff

member named Benny Santiago or socializing with any Santiago. (Ex. F at 25:8-25)  Despite

his years at RMSC, Porter denied knowing his colleagues' first names. (Ex. F at 26:7-27:15)

---

[15]  Benny Santiago was the only individual defendant named in a civil rights action filed against
the City of New York in this courthouse on May 19, 2015. *See Jane Doe 1 and Jane Doe 2 v.
The City of New York and Benny Santiago*, 15 Civ. 3849 (AKH) (the "*Santiago* "case).  Jane
Doe 1 and Jane Doe 2 (hereafter  SJD 1 and SJD 2, respectively, to distinguish them from Jane
Doe herein), alleged, *inter alia*, that Santiago sexually assaulted each of them in unmonitored
locations in separate incidents, years apart, and threatened to punish them if they did not comply
with his demands or if they reported his abuse. (*See Santiago* Complaint, 15 Civ. 3849, ECF 1)
SJD 1 and SJD 2 alleged further that other correction officers at RMSC knew Santiago was
raping SJD 1 and SJD 2 and participated in acts of retaliation. (Id. at ¶¶ 57-58, 72-75, 81-83,
85-88).  Finally, SJD 1 and SJD 2 alleged that the City was liable under 42 U.S.C § 1983
because Santiago's sexual abuse and retaliation was made possible by the culture fostered by
the City of New York at RMSC and the City's indifference to the fate of the women in custody
there. (Id. at ¶¶1-11)  In May 2017, SJD 1 and SJD 2 settled with the City and defendant
Santiago. (*Santiago* ECF 383 and 389, respectively)

[16]  Both Morgan and counsel for plaintiff repeatedly referred to Benny Santiago as a "captain,"
rather than a correction officer, during Morgan's deposition.  There can be no doubt, however,
that the Santiago described by Morgan was CO Benny Santiago.  As the City concedes, there is
no Captain Santiago at RMSC. ("[Chief Mirabal] stated there was no 'Captain Santiago' that
worked at RMSC during her tenure as Warden." City's expert report, page 20, attached as
**Exhibit L** to the Resnick Decl.)  Benny Santiago was on modified duty without access to
inmates after the investigation of him began in May 2013, just as Morgan testified. (See
**Exhibit M** to the Resnick Decl, Ryan Report at 10, ¶ 31)  In addition, Morgan referred to Benny
Santiago in passing by his nickname "Boo." (Ex. D at 60:20-25; see Ex. M at 12, ¶ 34)

## D.   EXPERT EVIDENCE OF THE CITY'S FAILURE TO PROTECT RMSC INMATES FROM SEXUAL ASSAULT BY DOC STAFF

In support of plaintiff's *Monell* claim, plaintiff also relies on the expert report of

Timothy Ryan, dated November 3, 2016, prepared initially for plaintiffs in the *Santiago* Case

and produced to the City in this case as plaintiff's expert report. (ECF 151-1, *see* ECF 149)

(The Ryan Report is annexed as **Exhibit M** to the Resnick Decl.)  Timothy Ryan, a former

warden with more than 44 years of experience in the corrections field, including leading the

operations of four of the largest jails in the United States and serving as President of the

American Jail Association, analyzed thousands of pages of documents and deposition testimony

in the *Santiago* case, concerning DOC customs, policies and practices, as well as the specific

sexual assault allegations against Benny Santiago by Jane Doe 1 and Jane Doe 2 (SJD 1 and

SJD 2). The Ryan Report incorporates other evidence probative of the City's liability, including

the DOJ PREA Report,[17] the Sexual Safety Assessment Report (or "Moss Group Report")[18] and

the DOI Hiring Report.[19]  The Ryan Report concludes that the City's practices:

> show a callous disregard for legal requirements and correctional professionalism
> and demonstrate 'deliberate indifference' by the City to the sexual safety and
> well-being of the female detainees for which it is responsible.

---

[17] *See* the 2013 report of the United States Department of Justice Bureau of Justice Statistics, prepared by Allen J. Beck, et al., U.S. Dep't of Justice, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12 (2013), http://www.bjs.gov/content/pub/pdf/svpjri1112. It is cited in the TAC at ¶ 283(e) as an exhibit to the Declaration of Kimberly M. Joyce, and is attached to the Second Amended Complaint as Exhibit 5 (ECF 44-5)

[18] *See* the June 2015 final report by the Moss Group, the City's retained third-party corrections consultant hired to assess sexual safety on Rikers Island. Its production was ordered in this case with the *Santiago* discovery of the PREA investigative files. (*See supra* at 16 and n. 9)

[19] *See* the January 2015 Department of Investigation (DOI) Report on the Recruiting and Hiring Process of NYC Correction Officers. It is cited in the TAC at ¶283(a)(*see* ECF 44-1) and is attached as **Exhibit N** to the Resnick Decl along with the press release of Commissioner Mark Peters ("Press Release").

21

(Ex. M at 25, ¶ 100) This "primary opinion" was supported by eight secondary opinions derived from a review and analysis of available information. We rely on the findings of the Ryan Report and highlight herein the underlying support for the expert opinions it contains.

## 1. The City has been out of Compliance with National Correctional Standards for Years.

The Ryan Report found that the City failed to implement specific proactive measures to address sexual abuse of female inmates despite its own directives and national "best practices" to ensure adequate assessments of instances of sexual abuse and the reporting of sexual abuse by victims. (Ex. M at 25-28, ¶¶ 101-14) In June 2015, the Moss Group – outside consultants hired by the City to assess sexual safety on Rikers Island – made 93 recommendations to bring the City into compliance with inmate sexual safety practices. (Ex. M at 28, ¶ 112)

The City was on notice of the need for corrective action as early as 2010 when news reports publicized staff-on-inmate sexual abuse at RMSC. The City's own records (including the PREA investigative files produced in the *Santiago* case) reflected "astoundingly high" numbers of reported staff-on-inmate sexual abuse allegations. (Ex. M at 26-27, ¶¶ 107-8) According to the published 2013 DOJ PREA Report, 5.9 percent of inmates at RMSC are subject to staff-on-inmate sexual abuse annually; 2.3 percent of RMSC inmates stated that they were "physically forced" to engage in sexual activity with a correction officer, and 5.6 percent reported that they felt pressured into sexual activity. (Ex. M at 26, ¶ 107, citing 2013 DOJ PREA Report) These numbers are more than double the national averages. (Id.)[20]

---

[20] The rate of 5.9% for RMSC inmates in 2011-2012 compares to 1.8% for all jails and 2.4% for female jails. See DOJ PREA Report at 13. (ECF 44-5 at 97)

## 2. The City's Hiring Practices are Inadequate.

Mr. Ryan found that the City's recruiting and hiring practices were woefully inadequate and contributed directly to a culture of sexual victimization. (Ex. M at 28-29, ¶¶ 115-17, see Ex. N) In particular, the DOI Hiring Report found that more than one third of recruits hired to serve in the DOC "had significant warning signs in their backgrounds – including criminal histories of domestic violence and improper preexisting relationships with incarcerated individuals." (Ex. M at 28-29, ¶ 116, citing Ex. N at 19, 21)[21] The DOI Hiring Report found a link between prior criminal activity of correctional staff and their propensity for inappropriate contact with inmates, requiring heightened scrutiny which DOC did not provide. (Id.) Consequently, the City's hiring practices should have, but did not, institute additional screening to ensure the elimination of candidates with significant warning signs – as mandated by the PREA standards that DOJ promulgated in 2012. (Ex. M at 28, ¶ 116)

---

[21] Although the City's official policy states that "proof of good character and satisfactory background" is an absolute prerequisite to serving as a correction officer (Ex. N at 5), that policy was abandoned in practice. Rather, the DOI found that the City's hiring process is "deeply flawed," such that one third of correction officers hired were "underqualified and unfit for duty" due to "multiple corruption and safety hazards." (Ex. N at 5 and Press Release) These results emanated from a "shockingly inadequate screening process" that was haphazard, antiquated and not standardized. (Ex. N. at 18-19, 21 and Press Release) There was a pattern of hiring decisions that were arbitrary, rife with patronage, lacking in documentation and that repeatedly "excused serious red flags without adequate explanation." (Ex. N at 8-10) Moreover, the rating system for candidates was "effectively useless," since "90 percent of applicants received a '3' rating" on a scale of 1 to 5, and the DOI found "confusion even on the basic fact of whether a "1" or a "5" was the best score." (Ex. N at 2, *see id.* at 8) On the whole, the City's screening process was inadequate to ensure "a safe and corruption free jail system" run by staff with "the strength of character to handle the stress of the demanding job of a CO and the integrity required to reject the temptations of corruption." (Ex. N at 23)

3.   **The Practice of Permitting Male Correction Officers to Guard Female Inmates without Supervision Violates Correctional Best Practices.**

The Ryan Report found that the City failed to protect female inmates from sexual assault

by male correction officers by leaving them under their exclusive supervision.  (Ex. M at 35-35,

¶¶ 150-57)  In particular, under both New York state law and *Cash v. County of Erie*, 654 F.3d

324 (2d Cir. 2011), it is unacceptable for men to supervise female inmates without being

accompanied by female correction officers.  (Ex. M at 35, ¶¶ 152-53)   However, the Ryan

Report found, it is nonetheless DOC practice to allow such supervision.   The DOC's practices

are also contrary to national correctional practices.   (Ex. M at 36, ¶¶ 155-56)  The DOC's

practices have resulted in male correction officers providing contraband to female inmates with

the expectation of sexual "favors" that they can then extract.   (Id.)

4.   **The City's Mechanisms to Report Sexual Assault are Deficient, including the Unwritten Code of Silence among Staff.**

The Ryan Report recognized that staff-on-inmate sexual abuse is likely underreported.

(Ex. M at 27, ¶ 109)[22]  Even the City's own records of reported staff-on-inmate sexual abuse

may "understate" the problem.[23]  There are systemic obstacles to gaining the trust and fortitude

of detained inmates to report allegations of sexual abuse.   There are few methods to report abuse

and, as the Moss Group Report found, intended avenues did not work. (Ex. M at 38-40, ¶ 167-

73)  The telephone reporting system was neither functional nor confidential, despite "industry

expectation for more than a decade that each of these reporting mechanisms should have been

---

[22] It is the City's policy to ignore allegations made via notice of claim and civil lawsuit.  SJD 1 filed a notice of claim in June 2013, while still incarcerated, that was never investigated.  (Ex. M at 6, ¶ 21)  Here, plaintiff's notice of claim and civil lawsuit were never reported to DOC. (ECF 108, see ECF 107) It is self-evident that the City understates sexual assault allegations by this practice and abdicates its responsibility to identify and deter sexual predators in its employ.

[23] Ex. M at 27, citing the "CRIPA" Investigation (Civil Rights for Institutionalized Persons Act) of the DOC Jails on Rikers Island, August 4, 2014 ("CRIPA Report)(referenced in the TAC at ¶ 283(b); (filed at ECF 44-2)

properly in place." (Ex. M at 39-40, ¶ 171) Reporting abuse to correctional staff, medical staff and faith-based staff also had serious shortcomings (as profoundly illustrated by investigators' mishandling of the allegations against Benny Santiago, *see* id. at 44-50, ¶¶ 196-236), and demonstrated a lack of training, lack of trust by inmates, and a failure by staff to report inmates' sexual abuse. (Ex. M at 38-40, ¶¶ 167-73). The grievance system is unavailable since sexual abuse is "not a grievable complaint under the City's policies." (Ex. M at 39, ¶ 171 and n. 225)

Another significant systemic impediment to the reporting of sexual abuse found by the Ryan Report is a "strong and culturally ingrained code of silence" which is a product of a "culture of impunity" in which DOC staff believe they will not be held accountable for their misbehavior and are unwilling to report other staff for misbehavior that is brought to their attention. (Ex. M at 33-37, ¶¶ 158-61) The Ryan Report found a systemic failure of DOC staff to adhere to the City's own directives in recording inmate and staff movement in the logbooks of RMSC. (Ex. M at 37-38, ¶¶161-66) Policy and procedure require that inmate movements between buildings be logged.

Yet, with regard to the allegations against Santiago, RMSC logbooks did not record the movement of SJD 2 over an extended period of time. She worked as a Suicide Prevention Aid (SPA) in Building 9 where she conducted rounds to monitor inmates on suicide watch. SJD 2 was housed in Building 11, where SJD 2 routinely came in contact with Santiago who was the steady officer assigned to the night shift (from 11:00 p.m. to 7:00 a.m.). (Ex. M at 6-7, ¶¶ 23-24) SJD 2 alleges that Santiago raped her several times between February and March 2013 in an empty cell or in the janitor's closet in Building 11. (Id.) The Ryan Report found that the DOC staff flouted their duty to maintain accurate logbooks, omitting any reference to SJD 2's movements between two buildings in the middle of the night when Santiago was on duty.

[The] movements were not logged in any produced logbook[24], meaning that a
half a dozen correction officers flaunted (sic) policy, and certainly creates (sic)
the suspicion that their omissions were done knowingly and for improper
purposes…Since it occurred night after night, and only when CO Santiago was
on duty in Building 11, the implications are absolutely clear.  To not have
questioned this action and/or reported it, is a violation of the 2008 Sexual Assault
Directive, as well as the PREA Standards.  And it is unrealistic to assume that
this was merely an oversight  - the failure to act was and absolutely had to be
intentional.

(Ex. M at 38, ¶ 165)(Emphasis added)

### 5.    **Inmates who Report Sexual Abuse Suffer Retaliation**

The Ryan Report found that even if mechanisms for reporting were available and

trusted, inmates were discouraged by a "systemic failure" of appropriate measures to protect

inmates from retaliation for reporting sexual misconduct.  (Ex. M at 40-41, ¶¶ 174-78)  The

Moss Group found that inmates fear staff retaliation; even custodial staff and non-custodial staff

at RMSC have expressed concern of retaliation for reporting sexual abuse.  (Id.)  SJD 2

experienced retaliation in 2013 from Santiago (who withheld food from her) and from several

inmates and correction officers who believed that she had "snitched" on Santiago. (Ex. M at 7-

8, 41-42, ¶¶ 25-27, 181-84)   SJD 1 overcame her fear of retaliation and reported the sexual

abuse she had suffered only "after learning that CO Santiago had been removed from RMSC (as

a result of SJD 2's report of her abuse)."  (Ex. M at 5-6, 41, ¶¶ 21, 179)

---

[24] It appears that an additional logbook sought by the plaintiff in *Santiago* was lost and not
produced by the City.  (Id. at 37 ¶ 163)

6.    **The City's Investigative Units Mismanage Investigations and thereby Encourage Sexual Abuse.**

The Ryan Report documents serious and systemic deficiencies in the DOC's investigation of allegations of reported sexual assault resulting in the vast majority of such investigations being deemed "not substantiated" or "unfounded" with no action taken.  (Ex. M at 26-27, 42-44, ¶¶ 106-107, 185-95).[25]  One glaring, consistent deficiency is investigators' adoption of a single perspective in approaching allegations of sexual assault - i.e. that it did not happen, or could not have happened, as alleged. (Ex. M at 43, ¶ 190) This one-sided approach guided the investigators' conduct, resulting in the non-pursuit of obvious leads, failure to obtain and consider corroborative evidence, and substantial gaps resulting in lost opportunities.[26] (Id.)  Compounding this fundamental problem was the unwillingness of DOC staff to be witnesses in investigations – evidence of a strong the code of silence – which was widely tolerated and perpetuated despite DOC rules authorizing termination of staff who fail to cooperate. (Ex. M at 43, ¶ 191)  "Due to those deficiencies, the City's own PREA consultants [the Moss Group] found that the City's investigations were 'tainted from the outset.'"  (Id)

The systemic failure of the City's investigation of correction officers implicates more than the failure to discipline and remove those individuals who are the subject of inmates' allegations of sexual abuse.  The City's inaction reinforces and perpetuates a culture of impunity and the code of silence among all DOC staff that ensures a continuous cycle of abuse.

---

[25] The rates of substantiated sexual assaults of staff-on-inmate misconduct – five percent (3 of 56 reports of sexual abuse at RMSC between 2011- 2013 were substantiated) -- are significantly lower than those found at other correctional facilities (Ex. M at 42, ¶ 186) and only half to one-third of the national average substantiation rate.  (Ex. M at 42, ¶ 187)  From 2011 - 2013, no allegations were substantiated against correction officers, as opposed to civilian staff. (Ex. M at 44, ¶ 194)  Mr. Ryan deemed this result "just not credible."  (Id.)(Emphasis added)

[26] In one striking example, investigators found unsubstantiated any misconduct by a correction officer who impregnated a female inmate, because they concluded that the correction officer impregnated the woman only after he bailed her out of jail. (Ex. M at 44, ¶ 93)

> That failure [to conduct an effective investigation of sexual misconduct] feeds into the DOC culture where the correctional staff know that there is a minimal probability that the City will discover sexual misconduct, and that, if discovered, the misconduct would not be effectively investigated so that, at conclusion, punishment would be unlikely.

(Ex. M at 42, ¶ 185)  The Ryan Report attributed this reality to complacency.

> In my opinion, so many years have passed under the City's deficient investigative regime that ingrained and systemic staff sexual abuse behaviors are endemic to the operation of the DOC and that those behaviors have become invisible to the complacent DOC leadership and accepted and tolerated by the custodial staff as "normal" practice.

(Ex. M at 44, ¶ 195)

The centerpiece of the Ryan Report's analysis of systemic mismanagement of

investigations of sexual assault abuse was the City's shameful mishandling of allegations

against Benny Santiago, a sexual predator, sparing him any accountability for his sexual abuse

of numerous female inmates over several years.[27]  The Ryan Report found the investigation so

flawed as to reflect "purposeful inaction" by investigators (Ex. M at 47 ¶ 214), including the

wanton loss of several pieces of key evidence and the mishandling of - and apparent tampering

with - a pair of jeans containing DNA proof of Santiago's sexual assault.

Between February and early May 2013, SJD 2 was repeatedly raped and subjected to

oral sex by Benny Santiago in an empty cell or janitor's closet in Building 11, while she was

working as a suicide prevention aid. (Ex. M at 7, ¶¶ 23-24).  She was infracted on May 4, 2013

for possessing contraband given to her by Santiago which she falsely attributed to another guard

for fear of retribution.  (Ex. M at 7, ¶ 25)  She was removed from the housing unit for five days.

---

[27] Santiago was placed on modified duty after SJD 2's allegations in May 2013 and was returned to full status in May 2016 and expected to receive a full pension when he retired in 2017. (Ex. M at 10, ¶ 31) Court records suggest that Santiago remained an employee of the DOC until at least April 2017.  (*Santiago* Dkt No. ECF 354-4)(medical record from DOC Health Management Division identifying Santiago's DOC command as QDC)

Upon her return, guards and inmates threatened and harassed her because they believed she had "snitched" on Santiago. Santiago withheld food from her as punishment. (Id.) On May 9, 2013, SJD 2 reported to a mental health clinician that she was being sexually assaulted but was advised "there was nothing that could be done." (Ex. M at 8, ¶ 26) She tried again the next day, and medical staff reported her allegations of sexual assault to DOI. (Id.)[28]

That day, May 10, 2013, two different DOI investigation teams met with her at RMSC, once including "lead investigator" James Christo. (See Ex. M at 45, ¶ 202) SJD 2 provided a detailed account of Santiago's sexual abuse, with dates and locations, and details of Santiago's personal life. (Ex. M at 11, ¶ 33) No notes were ever produced of these meetings, and a "garbled" and "incomplete" memo is included in the final case file. (Ex. M at 11-12, ¶¶ 33, 35) That same day, investigators interviewed Santiago for roughly five minutes in a public area of RMSC; they took no notes. (Ex. M at 12, ¶ 35) At an unknown date soon thereafter, investigators removed SJD 2's notebook from her cell; it contained diary entries of the sexual assaults and accurate contact entries for Santiago's home, email address and phone numbers. (Ex. M at 12, ¶ 34)

Critically, on May 10, 2013, an investigator retrieved a pair of jeans from SJD 2's cell that SJD 2 said was stained with Santiago's semen. (Ex. M at 10-11, ¶ 32) This evidence was mishandled from the beginning, with no effort to establish a chain of custody, resulting in conflicting testimony as to when the investigator gave it to Christo. (Id.) On May 16, 2013, the pants were sent to the Office of the Medical Examiner for testing. (Id.) After that point, DOI investigators took few investigative steps because, as Christo testified, they were waiting for the results of the semen tests on SJD 2's pants. (Ex. M at 14, 46, ¶¶ 37, 210) Consequently, the

---

[28] Days later, SJD 2 was briefly moved out of RMSC due to her allegations. When she returned, she received verbal threats from RMSC guards. DOI was notified of the retaliation but conducted no investigation and took no action. (Ex. M at 8, ¶ 27)

investigators failed to check the credibility of SJD 2's account by interviewing correction officers and medical staff or review housing logbooks and Santiago's duty records. (Id.) This "purposeful inaction" was an abdication of the "City's own rules of holding staff accountable." (Ex. M at 47, ¶ 214) In addition, critical evidence was not secured or simply lost.[29]

After May 10, 2013, as SJD 2's allegations against Benny Santiago were under investigation by DOI, the City failed to investigate several other allegations of sexual abuse against Santiago.[30] On July 23, 2013, while SJD 1 was still incarcerated at RMSC, she filed a notice of claim against the City for multiple rapes by Santiago at RMSC between 2008 and 2009 and in 2011. (Ex. M at 4-6, ¶¶ 18-21)[31] There is no evidence of any investigation by DOI, or any City agency, into SJD 1's allegations. (Ex. M at 45, ¶ 201) In June 2013, Christo was informed by a detective of a confidential informant who disclosed that a female inmate was then pregnant by Santiago and that another inmate was being recruited to have sex with Santiago.

---

[29] SJD 2 told investigators that she had disclosed Santiago's abuse by phone to a friend and spoken to Santiago in a three-way calls. Yet Christo did not bother to retrieve the CD of her recorded calls from RMSC after he requested them from DOC. The CD was subsequently lost, and all phone call recordings were purged. (Ex. M at 13, ¶ 36, at 47, ¶ 211) Nor were phone records from Santiago or anyone else ever subpoenaed to corroborate SJD 2's account. (Ex. M at 13, ¶ 36) Crucially, there was video footage from cameras in Buildings 9 and 11, based on "uncontested testimony" of SJD 2, that would have shown her movement between buildings without an escort and without corresponding logbooks entries – both contrary to RMSC rules – and corroborating her interactions with Santiago. (Ex. M at 13, 47, ¶¶ 36, 212) Christo claims he retrieved and reviewed the video, but it was lost, and its content was never documented. (Id.)

[30] Among these was an allegation recorded during a 2012 disciplinary hearing in which an RMSC inmate accused Santiago of having sex with two other female inmates and initiating the disciplinary action against her to dissuade her from reporting his misconduct. The captain presiding over the hearing appropriately forwarded the report of sexual assault to DOI at that time – but it was never recorded, let alone investigated. (Ex. M at 9, 45, ¶¶ 30, 203)

[31] In 2008-2009, Santiago raped SJD 1 during his night shift after the captain completed his rounds. (Ex. M at 4, ¶ 19) In September 2011, while escorting SJD 1 back from the medical clinic, Santiago raped her inside tents on the RMSC grounds where dorms called "the sprungs" had since been demolished. (Id.) Santiago threatened her not to report the rapes, and he visited her mother, which she understood as a threat. (Ex. M at 5-6, ¶¶ 19-21)

(Ex. M at 11, ¶ 30) Christo did nothing to investigate these allegations. When asked why he did not investigate these claims against Santiago, Christo perfectly encapsulated the City's indifference with his response: "I just didn't." (Id.)

After the City's tests on SJD 2's pants came back "negative" for semen, Christo closed the investigation of Santiago on June 30, 2014, declaring SJD 2's allegations "inconclusive." (Ex. M at 14, ¶ 39)[32] DOI concluded, however, that Santiago may have violated DOC policy by being "unduly familiar" with SJD 2; it referred the matter to DOC ID for appropriate disciplinary action. (Ex. M at 14, 48, ¶¶ 40, 219) But DOI's referral letter went missing (Ex. M at 48, ¶¶ 220-22) - malfeasance attributable to the lack of any auditing system, contrary to standard correctional practices. In January 2015, DOC ID received DOI's closing memorandum but with none of the supporting evidence. (Ex. M at 49, ¶ 226) After plaintiffs filed the *Santiago* lawsuit in May 2015, DOC ID investigators asked DOI for the evidence to support their investigation into Santiago's undue familiarity. (Ex. M at 49, ¶¶ 227-29) Christo refused, citing DOI policy to withhold supporting materials from DOC ID. (Ex. M at 49, ¶ 229) DOC ID then closed its investigation, citing DOI's failure to provide evidence and the running of the 18 month statute of limitations for administrative discipline. (Ex. M at 49, ¶¶ 230-31) As the Ryan Report notes, the 18 month clock does not apply where the misconduct complained of is a crime – such as SJD 2's allegations of rape. (Ex. M at 49, ¶¶ 231-32)

---

[32] In another expert report provided by plaintiffs in the *Santiago* case, a recognized DNA testing laboratory found evidence of a male contributor of DNA on the pants but the absence of any semen, and concluded that the jeans had been washed while in the City's custody. (*See Santiago* ECF 372, plaintiffs' expert report)

## POINT ONE

### SUMMARY JUDGMENT IS PRECLUDED FOR PLAINTIFF'S *MONELL* CLAIM, BECAUSE SEXUAL ASSAULT BY DOC STAFF IS AN OBVIOUS CONSEQUENCE OF THE CITY'S DEFICIENT PRACTICES

### A.    THE STANDARD OF REVIEW ON SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is

rendered if the movant shows "that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317,

322 (1986); *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 247-48 (1986); Fed.R.Civ.P. 56(c).

On a motion for summary judgment, the court must view the record in the light most favorable

to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus.*

*Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  A fact is "material" if it "might

affect the outcome of the suit under the governing law," and is genuinely in dispute "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.

2005) (*citing Anderson* ).

Once such a showing has been made, the nonmoving party must present "specific facts

showing a genuine issue for trial." Fed.R.Civ.P. 56(e).  The Court may not weigh the evidence

or credit the evidence of the party seeking summary judgment while ignoring evidence offered

by the non-movant. *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014)(per curiam).  Nor may

summary judgment be granted simply because the court believes that the plaintiff will be unable

to meet his or her burden of persuasion at trial; "there must either be a lack of evidence in

support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one

direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.,*

151 F.3d 50, 54 (2d Cir. 1998)(citations omitted).  Thus, "only when no reasonable trier of fact

could find for the nonmoving party" should summary judgment be granted. *Campo v. Slater,*

128 Fed.Appx. 173, 173-74 (2d Cir. 2005), *quoting Bldg. Trades Employers' Educ. Ass'n v.*

*McGowan,* 311 F.3d 501, 507-08 (2d Cir. 2002).

## B.   THE LEGAL STANDARD FOR *MONELL* LIABILITY

A municipality is liable under 42 U.S.C. § 1983 for the deprivation of a federal

constitutional right "if the governmental body itself 'subjects' a person to a deprivation of rights

or 'causes' a person 'to be subjected' to such deprivation." *Cash v. County of Erie,* 654 F.3d

324, 333 (2d Cir. 2011), *quoting Connick v. Thompson,* 563 U.S. 51, 60 (2011) (*quoting Monell*

*v. Dep't of Soc. Servs. of the City of N.Y.,* 436 U.S. 658, 692 (1978)).  A city is liable for the

unconstitutional acts of a municipal employee below the policymaking level "where the

violation of … constitutional rights resulted from a municipal custom or policy." *Vann v. City*

*of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995).  "The policy or custom need not be

memorialized in a specific rule or regulation," *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.

1996), but "may be pronounced or tacit and reflected in either action or inaction." *Cash,* 654

F.3d at 334. The existence of "written policies" that are contrary to the unconstitutional policies

followed by municipal employees "are of no moment in the face of evidence that such policies

are neither followed nor enforced." *Ware v. Jackson County, Mo.,* 150 F.3d 873, 882 (8th Cir.

1998), *citing City of St. Louis v. Praprotnik,* 485 U.S. 112, 131 (1988) ("Refusals to carry out

stated policies could obviously help to show that a municipality's actual policies were different

from the ones that had been announced").

To prevail on a claim of municipal liability, a plaintiff must satisfy a two-prong test.

Plaintiff must show (1) the existence of a municipal policy or custom and (2) that the policy or

custom directly caused the constitutional violation. *Monell,* 436 U.S. at 694; *City of Canton v.*

*Harris*, 489 U.S. 378, 389 (1989); *see Cash*, 654 F.3d at 333 ("plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury").

A plaintiff may demonstrate the existence of a policy, custom, or usage in a variety of ways. She may provide evidence of a formal policy officially adopted by the municipality. *Monell*, 436 U.S. at 690, or evidence that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997); *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions—either expressly or tacitly"), *quoting Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). She may also show a policy of inaction if the failure rises to the level of "deliberate indifference." *Connick*, 563 U.S. at 61-62 (municipality's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution'"), *quoting City of Canton,*, 489 U.S. at 378 (O'Connor, *J.,* concurring in part and dissenting in part).

To show deliberate indifference, it is not necessary "for plaintiffs to prove that a municipality has followed a particular course of action repeatedly in order to establish the existence of a municipal policy; rather, a single action taken by a municipality is sufficient to expose it to liability." *Amnesty Am.,* 361 F.3d at 125. As the Second Circuit has stated:

> [w]hile we have held that proof of a policymaker's failure to respond to repeated complaints of civil rights violations would be sufficient to establish deliberate indifference, *Vann,* 72 F.3d at 1049, we have never required such a showing. The

means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing. The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a "conscious choice" rather than mere negligence. *City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197 (internal quotation marks omitted)(citation omitted). Thus, plaintiffs' evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was "obvious," *Vann,* 72 F.3d at 1049, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction… a single instance of deliberate indifference on the part of a policymaker is sufficient to provide a basis for municipal liability; there is no need, as the district court apparently assumed, to establish that policymaking officials maintained a consistent "policy" of deliberate indifference.

*Id.* at 128; *Cash,* 654 F.3d at 334 (accord).

Once a triable issue of fact exists as to whether the municipality was deliberately indifferent to a constitutional violation, "the issue of causation remains to be decided by the jury." *Vann,* 72 F.3d at 1051.

Courts have recognized municipal liability where the procedures for monitoring incarcerated female inmates showed deliberate indifference to the risk of sexual assault. In *Cash,* 654 F.3d at 333, the Second Circuit reinstated a jury verdict on *Monell* liability for the municipality's failure to adopt a policy prohibiting male guards from being alone with female inmates. The Court found that sufficient evidence was produced at trial to show that the municipality was on notice that prison guards were engaging in sexual misconduct that fell short of forcible rape, demonstrating that the existing rules prohibiting non-assaultive sexual contact were ineffective to deter even nonviolent sexual assault. Further, monitoring devices, such as surveillance cameras, were inadequate to supervise one-on-one interactions. In addition, expert testimony showed that the existing rules, which did not prohibit unmonitored one-on-one interactions between male guards and female inmates, were inadequate to protect female inmates from sexual assault and contrary to accepted prison standards. *See Poore v. Glanz,* 46

F. Supp.3d 1191 (N.D. Okla 2014)(triable issue of fact whether policy and practice of housing

juvenile female inmates in a wing of the medical unit placed them at substantial risk of sexual

assault by jail staff where the wing was frequently single-staffed, not monitored by cameras or

visible to staff in the medical unit who were generally "very busy" with their duties; the

municipality was on notice of one prior incident of staff-on-inmate sexual assault; and the

occurrence of such assaults was likely underreported); *Rankins v. Howard*, 2012 WL 5932029,

*3 (E.D.Wisc. Nov. 27, 2012) (triable issue of fact whether municipality was deliberately

indifferent to plaintiff's safety where plaintiff's expert opined that monitoring of correction

officer was inadequate at time he sexually assaulted plaintiff).

> To hold a municipality liable for a failure to supervise, plaintiff must show that "the
need for better supervision to protect against constitutional violations was obvious but [the
municipality] made 'no meaningful attempt' to forestall or prevent the unconstitutional
conduct." *Amnesty Am.*, 361 F.3d at 127, *quoting Vann*, 72 F.3d at 1049. To preclude liability
for failing to investigate and discipline employees adequately, "it is not enough that an
investigative process be in place," rather, "the investigative process must be real" and "have
some teeth." *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996). Thus, when
confronted with a number of reports of sexual assault, it is incumbent upon the municipality to
take precautionary measures, including discipline and closer supervision, because it is
"axiomatic that unpunished crimes tend to breed more criminal behavior." *Ware*, 150 F.3d at
884-85.

> A city's failure "to exercise reasonable care in investigating claims" of misconduct by its
employees can be a basis for municipal liability. *Fiacco v. City of Rensselaer,* 783 F.2d 319,
326 (2d Cir. 1986); *see Thomas v. Roach,* 165 F.3d 137, 145 (2d Cir. 1999)("[a] municipality
may be liable under § 1983 in cases of police brutality where the City's failure to supervise or

discipline its officers amounts to a policy of deliberate indifference"); *Miller v. City of New London*, 2015 WL 2240269 *10 (D. Conn. May 12, 2015) ("failure to investigate [the challenged] incident and punish the responsible parties" is the "type of ratification of the illegal acts ... found to be a sufficient official policy") (quotation omitted); *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991) (policy may be inferred from "evidence that the municipality had notice of, but repeatedly failed to make any meaningful investigation into, charges that police officers had used excessive force in violation of the complainants' civil rights" ).

Deliberate indifference to the need for better procedures to investigate, discipline and monitor municipal employees may be shown, *inter alia*, through the filing of civilian claims of misconduct - "whether or not the claims had validity" - because the claims "put the City on notice of the possibility" of civil rights violations. *Vann*, 72 F.3d at 1049 (citation omitted). "Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was contrary to the practice of most police departments and was particularly dangerous because it presented an unusually high risk that constitutional rights would be violated." *Id.*

Thus, a triable issue of fact exists to preclude summary judgment on a *Monell* claim for failure to supervise and discipline municipal employees where a jury could find that the City's procedures for investigating, disciplining and monitoring its employees were inadequate to prevent plaintiff's injury. In *Vann*, the Second Circuit found a triable issue of fact that the police department's policies amounted to deliberate indifference where the evidence, including expert testimony, showed that civilian complaints of excessive use of force were improperly investigated and routinely found to be "unsubstantiated;" the filing of such complaints was not reported to supervisory units; officers subject to such civilian complaints were not monitored;

and the City's practices were contrary to the practice of most police departments. *Id.* at 1050-51. A jury could find that these policies "caused [the officer] to feel entitled" to use violence against plaintiff. *Id.* at 1051. *See Ewing v. Cumberland Cnty.,* 2015 WL 1384374, *28 (D.N.J. 2015) (denying summary judgment where a jury could find that use of force reports "were not used to root out misconduct," where the vast majority of internal reviews deemed the use of force justified, and an expert's analysis of use of force reports showed more internal investigations were warranted, coupled with evidence of "a culture of ignoring and failing to investigate misconduct"); *Merman v. City of Camden,* 824 F. Supp.2d 581, 591 (D.N.J. 2010) (denying summary judgment on claim of inadequate investigation and finding persuasive the fact that there was a significant number of civilian complaints against officers and a comparatively small number of disciplinary sanctions); *Beck,* 89 F.3d at 974-76 (3d Cir. 1996) (reversing grant of summary judgment on municipal liability claim where evidence showed that investigatory procedures into police misconduct were inadequate; there was no formalized tracking of complaints for individual officers; and there were civilian complaints of officer violence); *Ware*, 150 F.3d at 884-85 (affirming jury verdict against municipality where jury was entitled to infer a pattern of unconstitutional conduct from evidence of sexual assault and sexual misconduct by guard who raped plaintiff, and by other correction officers, and where "the County's failure to discipline[ its correction officers] was the moving force behind [plaintiff's] injury").

## C.    TRIABLE ISSUES OF FACT EXIST TO PRECLUDE SUMMARY JUDGMENT

### 1.    Inadequate Investigation and Discipline

There is a triable issue of fact as to whether the City's failure to adequately investigate and discipline DOC uniformed staff with respect to allegations of sexual assault shows a deliberate indifference to the sexual assault of female inmates by the City's employees. Among the evidence a jury may consider is: the high rate of sexual assault allegations against DOC uniformed staff at RMSC; the underreporting of sexual assault allegations that occurred due to, e.g. failed reporting mechanisms, a code of silence among staff and widespread fear of retaliation among inmates; the extremely high frequency of investigators' concluding that a sexual assault allegation is "unsubstantiated;" and the City's policy of not investigating allegations made by notice of claim or civil lawsuit which understates the number of sexual assault allegations and fails to identify and deter sexual predators. The City's deliberate indifference to the obvious need for corrective action is demonstrated, as well, by the Ryan Report's review of the systemic flaws in the City's practice and procedures at every phase of its investigation into sexual assault allegations, including the City's failure to meet numerous standards of accepted practice in the corrections field.

Once the Court determines that a triable issue of fact exists as to the City's deliberate indifference to the obvious need for corrective action in its investigation and disciplining of DOC staff, causation remains a question for the jury. *See Vann,* 72 F.3d at 1051. A reasonable jury could find that the City's culture of ignoring and mishandling investigations into sexual misconduct, and the resulting culture of impunity among DOC staff, was the moving force behind Captain Porter and CO Williams' violation of plaintiff's constitutional rights. Indeed, Plaintiff's own account attests to the fact that Captain Porter and CO Williams carried out their assaultive behavior in a manner brimming with a sense of impunity.

39

### 2.    Inadequate Hiring and Monitoring

As an independent ground for *Monell* liability, and coupled with the claim based on the

City's deficient investigation and disciplining of its DOC uniformed staff, there is a triable issue

of fact as to whether the City's screening procedures for the hiring of correction officers are

deficient and show a deliberate indifference toward sexual assault of female inmates at RMSC,

where an inordinate percentage of those hired are susceptible to corruption.   To be clear,

plaintiff does not contend that the City's hiring practices failed to weed out candidates who

posed a risk of violence or sexual assault.  Rather, the City's practices failed to eliminate

candidates who could not be trusted to abide by DOC rules that protect inmates, to report

misconduct by their fellow correction officers and to avoid the significant corrupting

opportunities available in a prison setting.

This challenge to the City's screening procedures is distinct from the challenge to a

single hiring decision at issue in *Bryan County*.   There, the Supreme Court cautioned against

holding a municipality liable for a particular hiring decision "allegedly traceable to an ill-

considered hiring decision" where a failure "to adhere to rigorous requirements of culpability

and causation [would collapse] municipal liability into *respondeat superior* liability."  *Bryan*

*County*, 520 U.S. at 415.  The Second Circuit has not addressed challenges to municipal hiring

procedures in general, *see Ruiz v. County of Suffolk*, 2012 WL 1118605, *6-8 (E.D.N.Y. Apr. 3,

2012), but the First Circuit has recognized that "a pattern of previous bad hiring decisions"

could "lead to constitutional violations" and render the municipality liable for deficient hiring, if

there was sufficient evidence to support "an inference of deliberate indifference." *Id., quoting*

*Young v. City of Providence*, 404 F.3d 4, 31 (1st Cir. 2005).  While such instances are likely

rare, this challenge presents that exceptional case.

Evidence that the City's hiring practices for DOC uniformed staff are inadequate, and

that the City is deliberately indifferent to constitutional violations, is simply overwhelming.  At

a minimum, it is sufficient to preclude summary judgment.  The DOI Hiring Report, and other

evidence in this case, provide compelling proof of the City's practice of inadequate screening

for correction officers, resulting in the hiring of an inordinate percentage – one-third – who had

significant warning signs in their background suggesting susceptibility to corruption once on the

job.[33] Not only does the record show a pattern of hiring practices that fail to disqualify

correction officers lacking good character, but these practices are qualitatively and objectively

inferior to those of the NYPD which efficiently reviews and disqualifies candidates whose

backgrounds suggest a susceptibility to corruption.[34]  (Ex. N at 18, 20)

This evidence supports an inference that the City's inadequate hiring practices show a

deliberate indifference to the obvious harm to inmates' safety.  A jury could find that the risk of

constitutional harm to the public from municipal employees lacking in good character is at least

as obvious for correction officers as for police officers.  Prison poses extraordinary and

unparalleled obstacles to reporting and deterring sexual assault by correction officers.  A victim

of a sexual assault in prison cannot cry out and have the assault contemporaneously observed by

---

[33] Indeed, DOI's review found a high percentage of on-the-job corruption attributable to hiring correction officers whose should have been disqualified from employment. Twenty-five percent of DOC correction officers who were arrested or recommended for disciplinary action in the year before the 2015 DOI report had serious red flags in their applications (Ex. N at 3)

[34] "In general, DOC's applicant screening process sharply contrasts with that of the NYPD APD [Applicant Processing Division]" and "DOC used significantly lower hiring standards than the NYPD." (Ex. N at 6)  In addition to formal training for the NYPD's investigators in the hiring process, the NYPD uses computerized application forms that require an answer, whereas DOC applicants left questions blank; the NYPD efficiently tracked applicant's files electronically and disqualified candidates automatically, and employed multiple layers of supervisory review, none of which existed in the DOC's screening process.  (Ex. N at 20)  Not surprisingly, the NYPD process rejected a number of DOC hires.  (Id.)

a witness who is neither the jailer nor the jailed. She has no control over the crime scene, or even her own body, to collect and preserve physical evidence. She cannot file a complaint without subjecting herself to severe retaliation by her jailers and fellow inmates.[35] Even after release, a former inmate is deterred from seeking vindication for a sexual assault by the daunting task of persuading a factfinder to believer her, when physical evidence and potential witnesses are unavailable. By contrast, a victim of police misconduct does not remain under the continuous custody and control of the police after the incident; she is free to gather evidence, identify witnesses and report any misconduct from the safety of her home and community.

Whether the City's deficient hiring process was the moving force behind plaintiff's constitutional violation is a question of fact for the jury at trial. A jury could find, based on the evidence cited herein, that, as a practical matter, the sexual safety of female inmates at RMSC depends entirely on the integrity of the DOC uniformed staff. No other purported safeguard provides any meaningful protection, where the unique circumstances of prison make any other deterrent to misconduct - such as handwritten logbooks - inadequate to prevent sexual assault. A jury could infer that a practice that failed to weed out an ordinate percentage of correction officers susceptible to corruption creates a culture that protects – even fosters – misconduct by correction officers. At a minimum, this culture allowed Captain Porter and CO Williams to trust that their colleagues would turn a blind eye to plaintiff's movements and to their own actions. Yet, the evidence shows much more: these defendants rewarded corruptible correction officers for their loyalty and assistance with the "perk" of sexually assaulting plaintiff. (*See* TAC ¶¶ 39-40, 47-48, 76-81)

---

[35] See, generally, H. Brenner, et. al., "Bars to Justice: The Impact of Rape Myths on Women in Prison," Georgetown Journal of Gender and the Law, Vol. XVII, No. 2, 2016.

## POINT TWO

### SUMMARY JUDGMENT IS PRECLUDED FOR PLAINTIFF'S CLAIM OF NEGLIGENT SUPERVISION GIVEN THE CITY'S NOTICE OF CAPTAIN PORTER'S HISTORY OF MISCONDUCT

Defendants' motion for summary judgment on plaintiff's Negligent Supervision Claim against the City should be denied because the record is more than sufficient to allow a trier of fact to conclude that the City was on notice ███████████████████████████████

████████████

### A.   THE LAW OF NEGLIGENT SUPERVISION AND RETENTION

To prevail on a negligence claim under New York law, plaintiff must show (1) a duty owed by defendants to plaintiff; (2) a breach of that duty; and (3) injuries proximately caused by the breach. *Stagl v. Delta Airlines,* 52 F.3d 463, 467 (2d Cir. 1995). A defendant may be held liable in negligence only for the breach of a duty of care that is owed to the plaintiff. *Sanchez v. State of New York,* 99 N.Y.2d 247 (2002).

A duty of care attaches to the City's safeguarding of its prisoners. *Sanchez,* 99 N.Y.2d at 252 ("Having assumed physical custody of inmates, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard inmates"). "It is well settled that the State is required to use reasonable care to protect the inmates of its correctional facilities from foreseeable risk of harm." *Anna O v. State of New York*, 34 Misc.3d 1206(A), 2011 N.Y. Slip Op. 52435(U), *6 (Ct. Cl. 2011), *citing Flaherty v. State,* 296 N.Y. 342 (1947). The "scope of the duty owed by the defendant is defined by the risk of harm reasonably to be perceived." *Sanchez,* 99 N.Y.2d at 252, *citing Palsgraf v. Long Is. R.R. Co.,* 248 N.Y. 339, 343, 162 N.E. 99 (1928)("[t]he risk reasonably to be perceived defines the duty to be obeyed").

The City, as an employer, will generally not be found liable "for the intentional act of an employee [ ] who perpetuates an act for his own purposes and outside the scope of his employment." *Anna O*, 34 Misc.3d 1206(A), at *6. However, the City may be held liable for its negligent supervision, retention or hiring of such an employee under a theory of negligent supervision or retention.

> To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: [i] that the tort-feasor and the defendant were in an employee-employer relationship; [ii] that the employer "knew or should have known of the employee's propensity for the conduct which caused the injury" prior to the injury's occurrence; and [iii] that the tort was committed on the employer's premises or with the employer's chattels.

*Zeak v. United States*, 2015 WL 246340, *3 (S.D.N.Y. Jan. 20, 2015), *quoting Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004).[36]

"A claim for negligent supervision or retention arises when an employer places an employee in a position to cause *foreseeable* harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in supervising or retaining the employee." *Doe v. Montefiore Hospital* 2013 WL 624688 *3 (S.D.N.Y. Feb. 19, 2013) (emphasis in original) (*quoting Vione v. Tewell*, 820 N.Y.S.2d 682, 687 (N.Y. Co. 2006), *citing Sheila C. v. Povich*, 781 N.Y.S.2d 342 (1st Dep't 2004); *see Patterson v. State*, 44 Misc.3d 1230(A), 2014 N.Y. Slip Op. 51382(U), *6 (Ct. Cl. 2014), *Anna O*, 34 Misc.3d 1206(A) at *6 (employer's negligence supporting negligent retention arises from its "having placed the employee in a position to cause foreseeable harm, harm which would most probably have been

---

[36] Defendants' proposition that plaintiff's Negligent Supervision claim is against public policy is frivolous. (Cf. Def. Mem. at 18) The cases defendants cite concern theories of negligence not applicable here, e.g. those for negligent prosecution and investigation. *Jenkins v. City of New York*, 1992 WL 147647, *8 (S.D.N.Y. 1992)("as a matter of public policy, there is no cause of action in the State of New York for negligent prosecution or investigation…Plaintiffs cannot circumvent the well-established requirements of the false arrest and malicious prosecution causes of action by inventing new theories of negligence") (quotation omitted)

spared the injured party had the employer taken reasonable care in making decisions respecting

the ... retention of his employees").

> "Negligent supervision requires a claimant to show that an employer knew or
> should have known—had the supervision been adequate—of the employee's
> propensity for the type of conduct that injured her" and "negligent retention
> requires a claimant to establish that the employer knew of should have known of
> the employee's propensity for the sort of conduct that caused the injury."

*Patterson,* 44 Misc.3d 1230(A) at \*5, *quoting Anna O.,* 34 Misc.3d 1206(A) at \*6.

An employee's propensity for harm is foreseeable to the employer - and thus actionable

under a negligent supervision theory - when the employer has constructive or actual notice of an

employee's "relevant tortious propensities." *Estevez-Yalcin v. Children's Village*, 331 F.

Supp.2d 170, 175 (S.D.N.Y. 2004); *see Timothy Mc. v. Beacon City School District,* 127 A.D.3d

826, 828 (2d Dep't 2015)(triable issue of fact on a negligent supervision claim where school

district received prior complaints of misconduct by bus driver); *Nevaeh T. v. City of New York,*

132 A.D.3d 840, 842 (2d Dep't 2015)(triable issue of fact on a negligent supervision claim

whether the Department of Education had knowledge of teacher's propensities arising from a

prior allegation of sexual abuse made by one of his former students).

A triable issue of fact exists as to the foreseeability of harm even if the prior allegation

against the employee was "unsubstantiated." *Patterson*, 2014 N.Y. Slip Op. 51382(U) at \*11

(rejecting argument that summary judgement was inappropriate where prior allegations against

correction officer were investigated internally and deemed unsubstantiated), *citing Morris v.

State of New York*, 34 Misc.3d 1243(A), 2012 N.Y. Slip Op. 5051(U), \*5 (Ct. Cl. 2012)

(summary judgment granted to claimant for negligent supervision of correction officer who

sexually assaulted her (corroborated by DNA proof) even though no prior allegations against

correction officer were substantiated and risk of his sexual misconduct to claimant in particular

was not demonstrated); *Anna O*, 34 Misc.3d 1206(A) at \*6-7 (summary judgment granted to

claimant for negligent supervision of guard who raped her while prison was conducting lengthy investigation into allegations of guard's prior unauthorized relationship with another inmate, during which time guard's access to female inmates was undiminished).  Even absent actual knowledge of a guard's propensity to cause harm, the City may have constructive knowledge of foreseeable risks arising from the unique circumstances of the prison setting.  *Rodriguez v. City of New York*, 38 A.D.3d 349, 350 (1st Dep't 2007), *citing Sanchez*, 99 N.Y.2d at 254 (issue of fact as to City's constructive notice of risk to plaintiff from rules and regulations relevant to foreseeability, correction officer's inattentiveness at precise time of attack, and officer's inability to view plaintiff from his assigned post).

It is not required that an employee have engaged previously in the same misconduct that is now alleged for the employer to have actual or constructive knowledge of the employee's propensity to engage in that behavior.  *Anna O,* 34 Misc.3d 1206(A) at *7 ("Defendant did not have to have notice of [guard's] propensity to behave in the exact manner in which he behaved with Claimant, only notice of his propensity for that 'sort of behavior'"); *T.W. v. City of New York*, 286 A.D.2d 243, 245-48 (1st Dep't 2001)(question of fact existed whether it is foreseeable that a person with convictions for violence would commit a sexual assault seven years after last conviction).  In addition, the employee's prior misconduct need not be as severe as the harm suffered by plaintiff to render the employee's propensity to harm plaintiff foreseeable to the employer.  *See Doe v. Chenango Valley Central High School District*, 92 A.D.3d 1016-17 (3d Dep't 2012)(issue of fact exists as to whether complaint of bus driver's prior conduct – lowering pants to expose adult diaper to group of children – put defendants on notice that driver had propensity to commit acts of sexual misconduct – including touching breasts and buttocks of female students while they were swimming during a field trip).

B.     **TRIABLE ISSUES OF FACT EXIST**

Plaintiff's Negligent Supervision Claim survives summary judgment because plaintiff

has met her burden of demonstrating the existence of a triable issue of fact that the City was on

notice ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ t is a question for the jury ████████████

████████████████████████████████████████████████████████████████ The City

may not preempt the factfinder's role by submitting to this Court that - as a matter of law -

"these incidents are insufficient to satisfy plaintiff's burden." (Def. Mem. at 19)  A record of

misconduct exists.  It is the City's burden to demonstrate entitlement to summary judgment.

The City has failed to meet this burden.


**POINT THREE**

**PLAINTIFF'S IIED CLAIM SURVIVES
SUMMARY JUDGMENT**

Plaintiff's claim for intentional infliction of emotion distress should survive summary

judgment, because the conduct alleged – despite the City's protestations  – is currently outside

the bounds of civilized society.  (Cf. Def. Mem. at 22-23)  Moreover, plaintiff has proffered

sufficient medical evidence of the mental distress caused by defendants.

## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment should be denied.  Claims 31 and 32 should survive against the City; and Claims 2, 3, 13, 14 and 21 should survive against the individual defendants.  These claims, and those not challenged by defendants, should proceed to trial.

Dated: New York, New York
       October 3, 2017

_____/s/_____
Ellen B. Resnick
LAW OFFICES OF ALAN S. FUTERFAS
565 Fifth Avenue, 7th floor
New York, New York 10017
212-684-8400
*Attorney for Plaintiff Jane Doe*